**In re AIR CRASH DISASTER NEAR CHICAGO, ILLINOIS ON MAY 25, 1979.**

**MDL No. 391.**

United States District Court, N. D. Illinois, E. D.

June 23, 1981.

Donald Madole, Spieser, Krause & Madole, Washington, D. C., Kevin Forde, Chicago, Ill., for plaintiffs Committee.

Thomas Allen, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for American Airlines.

Before ROBSON and WILL, Senior District Judges.

## MEMORANDUM AND ORDER

Plaintiffs' Committee for Liability Discovery has moved for sanctions against American Airlines, Inc. (American). They contend that American has obstructed and abused the discovery process throughout this action, and has ignored or disobeyed discovery orders of this court. Defendant American denies that any of its actions was improper, and requests costs and fees for responding to this motion. For the reasons hereinafter stated, plaintiffs' motion will be granted in part and denied in part. De-

fendant American's motion for costs and fees will be denied.

This action was consolidated in this court by the Judicial Panel for Multidistrict Litigation for coordinated pretrial proceedings of the claims of persons killed or injured in the May 25, 1979, American Airlines DC–10 crash near O'Hare Airport. After initial efforts to avoid a liability trial appeared to be unsuccessful, the court permitted liability discovery to begin in April, 1980. Plaintiffs selected a discovery committee to coordinate all their liability discovery. This discovery committee served both defendants with requests for production, requests for admissions, interrogatories, and deposition notices. The parties and the court worked out a procedure for handling the discovery. Pretrial Order No. 8, Practice and Procedure Order. The order contemplated that all liability discovery, including depositions would be completed by September, 1980.

Liability discovery became necessary when many plaintiffs rejected defendants' offered stipulation. The stipulation provided that each signing plaintiff would waive any claim for punitive damages and defendants would not contest their liability. The majority of plaintiffs, concerned with the wording of the stipulation or the possible availability of punitive damages, refused to stipulate. In their briefs, the parties expend great effort attacking or defending the stipulation. It is clear that whether or not the stipulation was a delaying tactic or a sincere good faith effort is irrelevant. While other factors may have played a role in the decision not to sign the stipulation, the major concern clearly was a reluctance to waive possible recovery of punitive damages.

On May 29, 1980, after extensive briefing of the issue, we held that punitive damages might be asserted against defendant McDonnell Douglas Corporation, but not against defendant American Airlines. 500 F.Supp. 1044. On January 5, 1981, the Court of Appeals for the Seventh Circuit reversed that decision as to McDonnell Douglas and affirmed as to American holding that, under the controlling Illinois law, neither defendant could be sued for punitive damages in a wrongful death action. 644 F.2d 594. Several plaintiffs have filed a petition for a writ of certiorari from that holding to the United States Supreme Court, which is currently pending.

From April to January, 1981, plaintiffs' committee conducted its own discovery and participated in depositions and discovery noticed by the defendants. Plaintiffs contend that American's actions throughout this period caused needless discovery costs and expenses so that all of the expenses for this period should be charged to American. Primarily, plaintiffs' claims are based on three matters: 1) that American's destruction of the "Eastburn report," and its actions to conceal that destruction, directly and indirectly imposed excessive and unnecessary costs on plaintiffs; 2) that American's failure to properly produce documents, as requested, and admit items requested in the plaintiffs' request to admit further directly and indirectly imposed unnecessary costs on plaintiffs; 3) that American's general failure to participate in good faith in discovery proceedings directly and indirectly led to additional unnecessary costs and delays.

American denies that any of its actions during discovery violated or contravened any court orders, or that it acted in any improper manner throughout these proceedings. American suggests that the motion is so frivolous and baseless that cost sanctions should be imposed on plaintiffs.

*Scope of Sanctions*

Plaintiffs' Committee has requested that American be required to pay all fees and expenses incurred by the discovery committee. American, on the other hand, contends that all these fees and expenses are unrelated to its conduct. It is clear that *some* of these expenses and fees are unrelated to any conduct of defendant American in this litigation. It is also clear, however, that *some* of these fees and expenses resulted solely from American's conduct in certain phases of the litigation.

The plaintiffs' committee incurred costs and fees in the appeals to the Seventh

Circuit Court of Appeals of this court's decisions on punitive damages and prejudgment interest. The fees and expenses related to those appeals clearly could bear no causal relation to American's conduct in discovery. Similarly, plaintiffs incurred expenses, and request fees, for depositions of McDonnell Douglas, NTSB, and FAA personnel. Again, these costs and whatever fees are associated with them bear no apparent relation to American's conduct.

The more difficult question relates to depositions of American employees, court appearances, conferences, and other costs related to motions to compel testimony and production by American, as well as appearances and conferences, redepositions and motions associated therewith. After review of the record in this action, it is apparent that many of these costs were incurred or increased due to American's conduct.

In order to ascertain which costs and fees are properly assessable against American, the conduct of the discovery in this action, and American's role in that process must be considered.

*Discovery Proceedings in MDL 391*

In addition to reviewing the history of American's actions in the Eastburn matter, it is also relevant to consider the actions and statements of American counsel at hearings in this court. On May 29, 1979, Judge Gilberto of the Circuit Court of Cook County, Illinois, entered an order directing the preservation of all records of MDC and American relating to, or which might be relevant to the May 25, DC–10 accident. A few days later, on plaintiffs' motion for a similar order in the District Court for the Northern District of Illinois, counsel for American advised Judge Hoffman of the existence of the state protective order, and agreed that American would destroy no documents that plaintiffs might attempt to obtain through discovery. Accordingly, no federal court preservation order was entered. At numerous times, in this court, when liability discovery was discussed, counsel and the court relied upon the Circuit Court preservation order.

On April 20, 1980, counsel for American stated in open court that they had complied with plaintiffs' request for documents except where objections to the production would be made. Objections, primarily that the request called for post-accident remedial measures, were made in May, 1980, and a motion to compel production was filed May 22, 1980. After briefing of this issue, the court, during the September 23, 1980, pretrial conference, overruled the objections except as to possible attorney-client and work product privilege. The court directed that any documents for which a privilege claim was being made be submitted *in camera*. The written order directing that submission was signed October 8, 1980. On November 6, 1980, MDC brought a motion to compel production. The court again directed American to submit all "privileged" documents *in camera* by November 13, 1980. The court cautioned American to review the documents to make sure a colorable claim of privilege existed. On November 13, 1980, American submitted documents *in camera*. The documents and the "list" accompanying them reveal the following:

1. The list did not identify which documents had been requested by plaintiffs, which by McDonnell Douglas Corporation or both, nor did it identify the basis for the claim of privilege.

2. Thirty-three documents on the list had either author or addressee or the date of the document, or all three listed as "unknown."

3. Four additional documents identified the author or addressee only by their initials.

4. No information accompanied the list as to the identity, position, or responsibility of most of the persons named therein. Neither did the list indicate who had received copies of the documents, even where this appeared on the document itself.

5. The "documents" included a letter from a court reporting company correcting testimony (Document 46); a cover letter stating that enclosed are the records requested by FAA (Document 1); letters merely transmitting final replies by Ameri-

can to outside agencies and companies (Documents 2, 10); a letter transmitting notices of depositions (Document 12).

6. The list included duplicates of documents with different descriptions for identical documents. Item 47 was listed as being authored by Randall Craft (although the addressee was "unknown"). Document 82, an identical document, was listed with both author and addressee "unknown."

7. Additional duplications were found upon examination of the documents. For example, the following documents were either wholly identical or parts of each other: Documents 17, 26, and 52; Documents 8 and 32; Documents 39, 40, 41, and 163; Documents 28 and 66; Documents 87 and 38; Documents 97 and 98; Documents 111 and 108; Documents 62 and 128; Documents 137 and 138; Documents 8 and 150; Documents 30 and 151; Documents 68 and 152; Documents 142 and 153; Documents 143 and 154; Documents 141 and 155; Documents 156 and 132; Documents 77 and 167. In many cases, the description on the list did not disclose this duplication. For example, in some cases, each "description" listed different authors or addressees for identical documents (Documents 8 and 32; Documents 39, 41, and 163; Documents 143 and 154; Documents 77 and 167).

8. Twelve documents were listed but were not actually included in the submission.

9. Minutes of Board of Directors meetings were submitted, but the attachments, which apparently were reports delivered at those meetings, were not included, (i. e., Attachment E to September, 1979, Board Meeting).

On the day the documents were submitted, American filed a motion "to deny production and not read documents." American contended that a review of the documents *in camera* would prejudice the court against their cause, and the court should either deny the request to produce or refer the matter to a magistrate. In support of this motion, American attached the affidavit of Gregory Long, one of American's California counsel, who stated that "Each (document) was either drafted by the attorney representing American in an attorney-client context or was drafted by employees of American or its attorneys at the request of American's attorneys." The court denied this motion. It is quite clear that the assertion under oath that each document was prepared by or for counsel is inconsistent with the failure to identify the author of a large proportion of the documents. It also is inconsistent with the substance of many of the documents. See, e. g., documents referred to in paragraph 5 hereof. American has offered no explanation for this inconsistency.

The first occasion on which the so-called "Eastburn report" was mentioned to the court was on November 6, 1980. McDonnell Douglas Corporation (MDC) filed a motion to compel the production of various documents. Among the documents requested was "Mac Eastburn's report, notes, drafts, etc." In that motion, MDC noted that, although American's attorneys advised them no written report was ever prepared, testimony from American employees indicated that some form of report had been prepared. The motion to compel production was granted. On November 7, and 12, 1980, MDC held 12(d) conferences with American attorneys relative to the request for and the order directing production. During the first conference, attorney Christensen of Overton, Lyman (American's California counsel) stated "[T]here seems to be an assumption on your part that there is a written Mac Eastburn report." Upon MDC stating they intended to apply for sanctions, Christensen replied, "You can't get sanctions for a report that doesn't exist. I'm making a statement to you now that this written report does not exist." During the November 12, conference, attorney Long (also of Overton, Lyman) stated, "[t]here are no such documents" referring to the Eastburn report. After a certain amount of discussion, attorney Guerin of MDC suggested American clarify whether it was their position that the document never existed or that it did exist at some point but had been destroyed. Long stated, "it does

not exist period." Alpert, counsel for Aviation Underwriters, stated that MDC was not entitled to ask whether the report had existed or not, and that the attorneys were not there to answer questions concerning the existence or nonexistence of documents. MDC then filed a motion for a rule to show cause why American should not be held in contempt. On November 20, 1980, MDC's motion came on for hearing. Haley, one of American Airlines' counsel, stated he had been informed that there was no Eastburn report, whether regarding the probable cause of the crash or otherwise, that anyone had been able to discover. The court asked whether semantic games were being played. Haley stated he certainly believed this was not the case. Haley suggested, and the court agreed, that MDC could finally ascertain whether the report existed or not during the Eastburn deposition scheduled to begin shortly.

On February 23, 1981, American filed a motion for an order to protect American employees from undue annoyance, oppression, and burden in reference to deposition notices served by MDC. Attached to that motion was an affidavit from Malahowski stating that "to the best of my recollection, all information ... received by me with respect to the Chicago Air Crash ... has been received in my capacity as a counsel for American." Attorney Alpert filed an identical affidavit. MDC filed their response on February 26, 1981. That response noted that the affidavits of Alpert and Malahowski apparently contended that the privilege applied to any instructions concerning the Eastburn investigation, or the destruction of the report, MDC strongly disagreed with that apparent contention.

On February 26, 1981, at the regularly scheduled pretrial conference in this cause, the question was discussed. Mr. Allen, another of American's counsel, suggested that the question of deposing the attorneys wait until after the Lloyd-Jones deposition. Judge Will, after noting that Lloyd-Jones was not going to produce the report either, rejected that suggestion. Allen then stated the attorneys did not advise that the report itself be destroyed, and there was nothing in the motion to indicate to the contrary. Judge Will noted that Mr. Allen could not testify as to what other lawyers had or had not said.

In response to questioning from Judge Will, Mr. Alpert stated that he had never seen anything called the "Eastburn report," and that he gave no instructions to anyone with respect to that report or any other reports or copies of reports. If any such instructions were given, he stated, they were given without his knowledge, and his first knowledge of any such instructions came at the time of Eastburn's deposition. He first learned of the Eastburn report when MDC filed their motion to compel production. (Tr. 58). Although he did know earlier that Eastburn was conducting an investigation as to some aspect of the accident he never found out what the Eastburn report covered. He further stated, that someone (unidentified) informed him that American Airlines was involved in a Maintenance Action Program to correct certain aspects of DC-10 aircraft maintenance but that Eastburn's report would not involve any aspects of the probable cause of the accident or anything relating to it. (Tr. 59). Mr. Alpert also stated that no one had submitted any testimony to the court from any of the people who reviewed the Eastburn report that it in any way came within the ambit of the Circuit Court preservation order. (Tr. 65). The court denied American's motion and ordered the deposition to proceed.

On March 13, 1981, during the deposition of Donald Lloyd-Jones, Senior Vice-President of American, the parties requested a telephone conference with the court regarding certain claims of privilege. Upon hearing the arguments, Judge Robson indicated it was his reaction that the questions fell squarely within Judge Will's earlier comments as not privileged. The parties requested briefing on the issue. American's position was that, although the activities of Eastburn's audit were not privileged, the role of counsel concerning advice on the destruction of documents was.

On March 23, 1981, the court overruled American's objections to most of the questions, and granted the motion to compel. The court's opinion stated that post-destruction advice on the legal consequences of destruction was the limit of any privilege in this area, and that advice to destroy was not privileged. Lloyd-Jones deposition then continued. Lloyd-Jones testified that Eastburn informed him in late August, 1979, that he had been instructed by counsel not to retain copies of notes or drafts of the report. He testified that some time in September, 1979, he confirmed with Malahowski, in-house counsel for American, that Malahowski had given such instructions to Eastburn. Some months later, he stated, Eastburn informed him that he had not retained any notes or drafts. He estimated that would have occurred in January, 1980. Lloyd-Jones testified that he is not certain he was aware at the time of his June, 1980, deposition either of the existence of the preservation order or that all copies of the Eastburn report were destroyed. Lloyd-Jones stated that at the time he discarded his copy of the report, he was not aware that it was the sole remaining copy, but that Malahowski informed him that no copies remained some time in the summer, 1980.

*American's Position re Eastburn Report*

American's position, once it acknowledged that a report had in fact been written at some time and, together with all notes, drafts and copies, had been destroyed on the advice of counsel, became that the Eastburn report was fully incorporated into the Maintenance and Engineering Action plan prepared by Schaefer. American now contends that the full contents of the Eastburn report are known and need not be the subject of speculation. American further contends that the Eastburn report was not subject to the Circuit Court protective order, and, since it was destroyed prior to MDC and the plaintiffs' request for its production, there was nothing improper about the advice to destroy or the fact of destruction of the report.

During the period April, 1980, to January 5, 1981, (when the plaintiffs' committee ceased their discovery efforts), plaintiffs' counsel attended and took depositions, reviewed documents and other materials, and appeared at pretrial conferences, all under the mistaken belief that all relevant reports had been released or were being submitted for a ruling on possible privilege. As indicated, American contends that the Eastburn report was not within the scope of the preservation order, and, because it was destroyed before discovery requests were filed, sanctions should not be ordered. This contention is untenable. A party may not destroy documents where a preservation order has been entered, conceal that destruction for almost one year, then claim that the preservation order never applied, and contend that, since the document no longer exists, it cannot be determined to have been within the ambit of the preservation order. Moreover, it is inconceivable that the Eastburn report did not deal with matters relevant to the issue of liability and the cause of the May 25, accident.

*Eastburn Report History*

Documents produced by American indicate that on July 17, 1979, Lloyd-Jones directed Mac Eastburn, Senior Director of Safety for American to prepare an investigation and report on the facts, circumstances, and cause of the May 25, 1979, DC–10 accident. The investigation, as originally conceived, clearly included the probable cause of the accident. Eastburn and Lloyd-Jones testified that sometime around the NTSB hearings, or shortly thereafter, the scope of the investigation was altered to exclude all matters relating to the crash itself, and the report/audit was to constitute a review of practices and procedures used in American's DC–10 operations. Eastburn and Lloyd-Jones both testified that neither contacted other American personnel who had been notified of the original investigation to inform them of any change.

During September, 1979, two in-house briefings were held by American regarding the Eastburn report. Prior to this time, Eastburn had instructed his "teams" that

only the team chiefs were to keep notes, that these notes were to be delivered to him, and that no copies of such notes were to be made. Eastburn testified at his deposition that he prepared his draft report, and destroyed the notes of the team chiefs. He stated that these actions were taken on the advice of house counsel for American, Richard Malahowski. Eastburn testified that, following the second briefing, he made final corrections and sent the sole copy of the report to Lloyd-Jones. He stated he also either sent a copy to legal counsel or informed them that the sole copy had gone to Lloyd-Jones. Eastburn had earlier testified that he had notified Lloyd-Jones of his instructions from Malahowski, and had been advised to follow those instructions.

Lloyd-Jones testified at his second deposition in March, 1981, that he had "discarded" the Eastburn report. He stated that he compared the Eastburn report with the Maintenance and Engineering Action Plan (M & E plan) prepared by Schaefer of American. He was satisfied that the matters discussed in the Eastburn report were covered by the M & E plan. He testified he therefore wrote "superseded" on the Eastburn report, and threw it in his wastebasket. Lloyd-Jones testified that he earlier either gave the report to Schaefer or had caused Schaefer to receive a copy of the report so that he could include it in the M & E plan.

Schaefer testified that after the second briefing, he asked Eastburn for a copy of the report to compare it with his M & E plan, then in draft form. He testified Eastburn gave him the draft, but instructed him to make no copies, and to return the draft to Eastburn when he was through. Schaefer testified that he made four copies, showed the report to certain members of his staff, and compared it with his M & E plan. Schaefer did not testify that either Eastburn or Lloyd-Jones, or any other American employee requested that he make the comparison.

Eastburn, moreover, could not recall the number of pages in his report. He testified that it was more than ten but less than fifty. Lloyd-Jones testified that it was twenty pages long. Schaefer testified it was between twenty-five and fifty pages. When questioned regarding the contents of the M & E plan, Schaefer stated it was difficult to determine which elements came from the Eastburn materials, reports prepared by NTSB, FAA and others, or which were generated by his own personnel. Eastburn similarly could not recall what specific areas were reviewed in formulating Schaefer's recommendations. On many items, Eastburn could not recall whether the matter was discussed in his report or not. Lloyd-Jones, during his March, 1981, deposition, also experienced difficulty in remembering more than whether or not an item might have been in the report. On some items, Eastburn's testimony and that of Lloyd-Jones varied on whether or not certain items were discussed: Items 8 & 9, development of standard training requirements (Eastburn yes, Lloyd-Jones no); Item 13, reorganizing the general technical manual (Eastburn yes, Lloyd-Jones no); Item 25, procedures for prototype requirements on Fleet Campaign Directives (Eastburn yes, Lloyd-Jones no); Items 37, 42, 43, 44, ground equipment fueling procedures, maintenance training, technical support, preventive maintenance on jacks, (Eastburn yes, Lloyd-Jones no). On others, neither Lloyd-Jones nor Eastburn could recall whether the item was in the Eastburn report: Item 21, revising work card development; Item 22, revising maintenance work release procedure; Item 29, release of MWR to FAA; Items 34, 35, 36, updating reliability document, developing improved pilot report of discrepancies system. In any case, it is clear that neither Lloyd-Jones nor Eastburn apparently could give any useful description of the items covered in the Eastburn report, the manner in which they were covered, the reports by the team members or the operations or offices they examined.

American's contention that the contents of the Eastburn report are known and need not be a matter of speculation is clearly incorrect. The American employees most responsible for the report could not agree even on the *number of pages* in that report much less its content.

*Rule 37(a)*

Production of documents upon request is governed by Rule 34 of the Federal Rules of Civil Procedure, F.R.C.P. 34. That rule provides in part: "If objection is made to part of an item or category, the part shall be specified." The party submitting the request may move for an order under Rule 37(a)·with respect to any objection to or *other failure to respond to the request. . .*" F.R.C.P. 34(b). Rule 37(a) provides, in part: "A party . . . may apply for an order compelling discovery." Rule 37(a)(4) provides that upon granting of the motion, the court *shall* require the party whose conduct necessitated the motion or the attorney to pay the reasonable expenses incurred in obtaining the order including fees unless the refusal was substantially justified. The costs and fees which are to be awarded on this motion include costs for 12(d) or other conferences, preparation of motions and court time. *Aerway Laboratories v. Arco Polymers, Inc.*, 80 C 2327 (N.D.Ill. filed May 28, 1981) (Shadur, J.); *Persson v. Faestel Investments, Inc.*, 88 F.R.D. 668 (N.D.Ill. 1980) (Shadur, J.); *See also* Schaefer, *Sanctions under Rule 37(a); The Old Order Changeth*, 62 Chi.B.Rec. 168 (Jan.-Feb., 1981).

In this action, American's objections to plaintiff's request for production of documents were not substantially justified. The first set of objections, post-accident remedial measures, was clearly incorrect. The privileged documents are, to a large extent, clearly not privileged. It appears therefore, that costs and fees associated with the motions to compel, including 12(d) conferences, should be awarded to plaintiffs.

Additionally, American's failure to produce the documents *in camera* after the September 28, 1980, direction and the October 8, 1980, order was a clear failure to respond. Therefore, it appears that costs and fees regarding the "privilege" objections, including 12(d) conferences and court appearances should be awarded to plaintiffs.

Additionally, American's failure to produce the Eastburn report due to its undis-closed destruction of that report was also a "failure to respond" within the context of Rule 34(b).

*Rule 37(b)*

 On September 28, 1980, the court overruled American's objections to production of documents. On April 20, 1980, American had told the court that other than those objections, all requested documents had been produced. Not until March, 1981, did it become clear to the court that the Eastburn report, and all copies, drafts and notes of that report, had been destroyed by American. During the intervening months, plaintiffs and McDonnell Douglas noticed and attended depositions of American employees. Rule 37(b) provides that upon failure to comply with an order of court relating to discovery, the court *shall* require the party "failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, *caused by the failure*, unless the court finds the failure to obey *substantially justified.*

Like Rule 37(a), Section b requires that costs be assessed unless the failure to obey the order was *substantially justified.* Contrary to American's assertions, there have been at least two failures to obey orders of court. First, American failed to obey the October 8, 1980, order to submit the "privileged" documents *in camera* until after another court order in November, 1980. The fact that the court permitted the filing at that time does *not* relieve American from assessment of costs and fees for the failure to obey the first direction. Similarly, the fact that the first order did not specify a date by which the documents must be submitted is irrelevant. Court orders are effective when entered. American was ordered to submit the documents as of October 8, 1980. Plaintiffs are entitled to costs and fees, if any, incurred as a result of the failure to obey the first direction to submit the documents.

Second, and more seriously, American ignored the court order directing that the answers to the request for production be filed within a certain time, ignored the or-

der compelling production and overruling objections in September, 1980, ignored the order in November 6, 1980, to produce the documents to plaintiffs and to MDC. American failed to produce the Eastburn report or report its destruction until depositions of American employees completely revealed that destruction. American failed to advise the court that the document had been destroyed on the *advice of American's counsel.*

American's sole defense to these repeated refusals to reveal the existence and destruction of the Eastburn report is that destruction was complete by the time discovery was commenced. American's sole defense to the charge that they violated the Circuit Court preservation order and their preservation stipulation in this court is their self-serving assertion that the document was not subject to the preservation order or stipulation.

The parties expend much time and effort in discussing the "adverse inference" rule, and its application to the presumptions of the contents of the report. Plaintiffs contend that application of this rule, and other evidence, indicate that the Eastburn report showed that American knew of the crack in engine N110 prior to the accident. American refutes this suggestion with the assertion that the contents of the report are known, that the other evidence is contradicted by deposition testimony, and that the "adverse inference" rule does not require or support the contention of American's prior knowledge, or that such information was contained in the Eastburn report. Both plaintiffs and American miss the point. This is not a trial on liability, and the court is not required to find whether or not American knew of the crack. The purpose of this motion is to determine what, if any, costs and fees were caused by American's conduct.

The "adverse inference" rule does apply to this motion, however. That rule basically holds that upon a party's willful failure to produce evidence, there is a presumption that the evidence would have been unfavorable to that party. American has not pro-

duced the Eastburn report. Its inability to do so is self-inflicted. It cannot be determined with mathematical certainty which depositions, motions, or court appearances, would have been avoided had American produced the report as requested in April, 1980. The proper "adverse inference" is that to the extent that depositions, court appearances, or motions may or were related to the apparent subject matter of the Eastburn report, i. e., the probable causes of the accident and recommendations for future procedures to avoid further similar accidents and to the extent that American cannot produce competent evidence to the contrary, American must reimburse plaintiffs for costs and fees related to all depositions, court appearances, or motions dealing with the Eastburn report or which might have been unnecessary had the Eastburn report not been destroyed.

## Additional Matters

Plaintiffs further request reimbursement for costs and fees incurred due to American's failure to timely answer requests for admissions, and American's general failure to participate in good faith in the discovery plan. Although it is uncertain whether American's actions with regard to the request for admissions could be considered improper, there is a more fundamental problem regarding this request. Sanctions must bear a reasonable relation to the conduct which is asserted to be improper. In this action, plaintiffs have not adequately explained how American's failure to answer the request for admissions due to their interpretation of the Practice and Procedure Order harmed plaintiffs. Absent *some* causal relationship between the fees and the conduct, no fees or expenses for this conduct can be awarded.

## American's Motion for Costs and Fees

American has moved for costs and fees for responding to this motion, characterizing it as frivolous. The motion is clearly not frivolous or improper, and American's motion must be denied.

*Conclusion*

For the reasons stated, the motion of Plaintiffs' Committee for sanctions against defendant American Airlines is granted in part, and denied in part. Defendant American Airlines will pay all costs and fees incurred in depositions, motions, or court appearances which related to or were made necessary by the Eastburn report's destruction.

Plaintiffs are also entitled to be reimbursed for any fees and expenses made necessary by American's failure to comply in good faith with discovery requests including document production, submission of allegedly privileged documents for *in camera* inspection, requests for admissions, etc., including fees and expenses in connection with this motion.

Plaintiffs are directed to file affidavits indicating expenses and fees for each matter they claim under this order. Plaintiffs shall also supply the court with information as to why and how each matter is alleged to be related to the Eastburn report's destruction, refusal to comply with discovery requests or this motion. Defendant American shall respond to such submission within ten (10) days thereafter.

IT IS SO ORDERED.