# IN THE COURT OF APPEALS OF TENNESSEE
## MIDDLE SECTION AT NASHVILLE

FILED

Nov. 3, 1995

Cecil Crowson, Jr.
Appellate Court Clerk

JOSEPH F. MANSFIELD,    )
             )
  Plaintiff/Appellant,   )
             )  Williamson Chancery
             )  No. 21482
VS.           )
             )  Appeal No.
             )  01-A-01-9412-CH-00587
DEBORAH ANN WILLS MANSFIELD, )
             )
  Defendant/Appellee.   )

## APPEAL FROM THE CHANCERY COURT FOR WILLIAMSON COUNTY
## AT FRANKLIN, TENNESSEE

### THE HONORABLE HENRY DENMARK BELL

For the Plaintiff/Appellant:      For the Defendant/Appellee:

Robert Todd Jackson        Mary Frances Lyle
Nashville, Tennessee         Bruce, Weathers, Corley,
                Dughman & Lyle
              Nashville, Tennessee

## AFFIRMED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This appeal involves a divorce that ended a brief, unhappy marriage. Both the husband and the wife sought a divorce in the Chancery Court for Williamson County. The trial court, sitting without a jury, declared the parties divorced and directed the husband to pay certain pre-divorce debts and to continue making *pendente lite* support payments until the wife received her share of the increase in the parties' net worth during the marriage. The trial court later ordered the husband to pay the wife an additional $4,405 for the legal expenses she incurred to compel compliance with her discovery requests. The husband insists on this appeal that the trial court should not have required him to assume the debts the wife incurred prior to the divorce or to pay the wife's discovery-related legal expenses. We have determined that the evidence supports the trial court's decision on both issues and, therefore, affirm the judgment.

## I.

Joseph F. Mansfield met Deborah Ann Wills Mansfield on a blind date in August 1986. Mr. Mansfield was ten years older than Ms. Mansfield, and both parties had been married before. Mr. Mansfield was employed by Capitol Records in Hollywood, California, and Ms. Mansfield worked for a music publishing and artist management company in Nashville. She also owned a small interest in a personnel agency. The parties dated sporadically and decided to marry after Mr. Mansfield accepted a job in Nashville with Liberty Records.

The parties married in Tennessee on June 30, 1990. Accompanied by Ms. Mansfield's minor son from her first marriage, they moved into a home in Brentwood that Mr. Mansfield purchased shortly before the marriage. Mr. Mansfield later left Liberty Records to start his own business as a marketing consultant to various record labels in Nashville. Ms. Mansfield stopped working before the marriage to concentrate on her household responsibilities. She also supported Mr. Mansfield's consulting business.

Although the marriage appeared outwardly successful, it was troubled from the very beginning. Conflicts quickly arose stemming from Mr. Mansfield's interest in pornography and his insistence that Ms. Mansfield wear sexually provocative clothes while entertaining business guests. Ms. Mansfield, for her part, was extremely jealous of Mr. Mansfield and suspicious about his marital fidelity. The parties had heated and, on occasion, physically violent arguments. Mr. Mansfield sued for divorce in August 1990 but dismissed the complaint one month later after Ms. Mansfield agreed to moderate her suspicions about his faithfulness.

Mr. Mansfield filed a second divorce complaint in July 1992 and obtained an order restraining Ms. Mansfield from harassing him and from destroying or dissipating marital assets. Ms. Mansfield counterclaimed for divorce in February 1993. A short time later, Ms. Mansfield and her son moved out of the marital home. Ms. Mansfield requested the trial court's permission to remove furnishings from the house and also sought an order directing Mr. Mansfield to provide her with funds to establish a separate residence. On April 19, 1993, the trial court entered an order directing Mr. Mansfield to pay Ms. Mansfield $5,200 to establish a separate residence and permitting Ms. Mansfield to enter the home to remove specific household furnishings.

Preparation for trial was delayed because Mr. Mansfield and his lawyer refused to respond to Ms. Mansfield's discovery requests. In September 1993 Ms. Mansfield requested *pendente lite* support and an order directing Mr. Mansfield to complete discovery. Mr. Mansfield retained new counsel, and on October 11, 1993, the trial court directed Mr. Mansfield to complete his responses to Ms. Mansfield's discovery requests and to pay Ms. Mansfield *pendente lite* support for five months.[1]

---

[1]The monthly *pendente lite* support included (1) payment of $1,200, (2) the monthly payments for Ms. Mansfield's 1991 Mercedes, (3) Ms. Mansfield's automobile insurance premiums, and (4) medical insurance for Ms. Mansfield.

On the day following the entry of the order granting Ms. Mansfield *pendente lite* support, Mr. Mansfield petitioned to hold Ms. Mansfield in criminal contempt for three violations of the July 1992 restraining order. In December 1993, the trial court found that Ms. Mansfield had violated the restraining order on two occasions and imposed two concurrent 10-day sentences on her. The trial court suspended the sentences and placed Ms. Mansfield on unsupervised probation.

Ms. Mansfield changed lawyers in February 1994. The trial court eventually heard the proof in the divorce case over five days in late March and early April 1994. In a final divorce decree filed on May 2, 1994, the trial court declared the parties divorced pursuant to Tenn. Code Ann. § 36-4-129(b) (1991). It awarded Ms. Mansfield her 1991 Mercedes as well as $75,000 representing her share of the increase of the parties' combined net worth during the marriage. The trial court also directed Mr. Mansfield to be responsible for all debts incurred prior to October 11, 1993, except for the debt related to Ms. Mansfield's automobile, and ordered Mr. Mansfield to continue paying Ms. Mansfield $1,200 per month and to continue making her automobile payments until he had paid the $75,000 judgment.

In addition to adjudicating the financial matters relating to the divorce, the trial court awarded Ms. Mansfield reasonable attorneys' fees incurred to compel Mr. Mansfield to comply with the discovery rules but directed that the award be reduced by the attorneys' fees Mr. Mansfield incurred with regard to the contempt proceedings against Ms. Mansfield. The trial court conducted another hearing on the attorneys' fees issue in June 1994 and filed an order on July 13, 1994, directing Mr. Mansfield to pay Ms. Mansfield an additional $4,405 "as the expense of enforcement of discovery issues during the divorce proceedings."

## II.

We turn first to the award of $4,405 to Ms. Mansfield for the legal expenses she incurred to compel Mr. Mansfield to comply with the discovery rules. Mr.

Mansfield takes issue with this award because it included services not directly related to the preparation and presentation of the September 1993 motion to compel and because the proof supporting the request for these fees was not sufficiently detailed. We have determined that the evidence does not preponderate against the trial court's conclusion that Ms. Mansfield is entitled to receive an additional $4,405 because of Mr. Mansfield's failure to respond to her timely and proper discovery requests.

## A.

Two months after Mr. Mansfield filed his divorce complaint, Ms. Mansfield's lawyer prepared and served interrogatories and a request for production of documents on Mr. Mansfield. This discovery involved the financial aspects of the parties' marriage and sought routine information that would provide a complete picture of the parties' financial position for use in negotiations or trial. Ms. Mansfield's lawyer did not press for responses to these requests after Mr. Mansfield's attorney informed him that the parties were discussing a possible reconciliation.

Ms. Mansfield's lawyer renewed his requests for discovery in January 1993 after his client informed him that reconciliation was not possible. When he received no response from Mr. Mansfield's lawyer, Ms. Mansfield's lawyer prepared a motion to compel Mr. Mansfield to answer the discovery requests and informed Mr. Mansfield's lawyer that the motion would not be heard until March 2, 1993, in order to provide ample time to provide the discovery voluntarily. Following a conversation with opposing counsel in late February, Ms. Mansfield's lawyer prepared and filed an order extending the time for responding to his discovery requests to March 12, 1993.

On March 10, 1993, Mr. Mansfield's lawyer provided his adversary with a partially completed, unsigned draft of his client's answers to the interrogatories. He stated that he could not provide any of the requested documents because they were contained in a filing cabinet that Ms. Mansfield had removed from Mr.

Mansfield's home. Since Ms. Mansfield had not taken any of Mr. Mansfield's financial documents, her lawyer and one of his paralegals prepared seventeen[2] separate authorizations permitting them to gain direct access to Mr. Mansfield's accounts. Ms. Mansfield's lawyer mailed these documents to his adversary for Mr. Mansfield's signature. Mr. Mansfield's lawyer did not return the signed authorizations to Ms. Mansfield's lawyer despite repeated assurances that he would do so.

On July 7, 1993, Ms. Mansfield's lawyer filed a motion to compel Mr. Mansfield to execute the authorizations. On the eve of the hearing of the motion, Mr. Mansfield's lawyer informed his adversary that Mr. Mansfield had delivered three boxes of documents to his office and that he was prepared to turn them over to Ms. Mansfield's lawyer without even examining them. Following a hearing on July 13, 1993, the trial court directed Mr. Mansfield to execute the releases.

Ms. Mansfield's lawyer obtained the three boxes of unidentified documents from Mr. Mansfield's lawyer and requested one of his paralegals to inventory and catalogue the documents. They soon discovered that the boxes contained many records that they had not requested and that they did not contain many of the records that they had requested. Sorting through the documents took approximately three days because the documents were neither identified nor catalogued.

Ms. Mansfield's lawyer continued to press his adversary to return the signed authorizations for access to Mr. Mansfield's accounts. In early August 1993, he sent Mr. Mansfield's lawyer a two page list of missing documents. After receiving no satisfactory response, Ms. Mansfield's lawyer filed a motion to compel Mr. Mansfield to comply with the prior discovery orders and to recover sanctions, including attorneys' fees, for Mr. Mansfield's failure to comply with the earlier discovery orders.

---

[2]Although the record contains twenty authorizations, Ms. Mansfield's lawyer discusses only seventeen in his testimony. The discrepancy is not significant.

Mr. Mansfield retained new lawyers shortly thereafter. His new lawyers participated in the October 4, 1993 hearing of all the pending motions, including Ms. Mansfield's motion to compel discovery. At the hearing, Ms. Mansfield's lawyer presented an affidavit stating that prior to October 4, 1993, he had expended 7.75 hours in connection with the efforts to obtain discovery from Mr. Mansfield and that his paralegal had spent fifteen hours for the same purpose. On October 11, 1993, the trial court directed Mr. Mansfield to provide Ms. Mansfield with copies of all his financial documents and ordered Ms. Mansfield to provide Mr. Mansfield with a "master list of missing documents." The trial court took Ms. Mansfield's request for sanctions for failure to respond to her discovery requests under advisement.

Mr. Mansfield's responsiveness to Ms. Mansfield's discovery requests improved dramatically after he changed lawyers. However, a paralegal working for Ms. Mansfield's lawyer was required to spend a significant amount of time after the October 1993 hearing reconciling the contents of the three boxes of documents with Mr. Mansfield's discovery responses and preparing the "master list of missing documents" ordered by the trial court.

Based on the evidence presented at the divorce hearing, the trial court issued a memorandum opinion concluding that Ms. Mansfield was entitled to reasonable attorneys' fees relating to compelling Mr. Mansfield to comply with the discovery rules but that this recovery should be reduced by the attorneys' fees Mr. Mansfield incurred in prosecuting the criminal contempt charges against Ms. Mansfield. The trial court left the parties to negotiate the amount of this award but left open the possibility of another hearing if they could not agree.

The trial court conducted another hearing when the parties reached an impasse on the amount of attorneys' fees. Ms. Mansfield's former lawyer stated that he and his paralegal spent 80.25[3] hours relating to their efforts to obtain and

---

[3]Sixteen of these hours represented work by Ms. Mansfield's former lawyer, and 60.25 of these hours represented work performed by the lawyer's paralegal.

decipher Mr. Mansfield's discovery responses and that the total billings for these services was $6,576.25.[4]  Mr. Mansfield's lawyer stated that his bill for the services connected with the contempt proceeding was $1,575.[5]  He also took issue with the amount of Ms. Mansfield's attorneys' fees because they were not documented in adequate detail and because they included time that ordinarily would have been spent even if Mr. Mansfield's discovery responses had not been dilatory and inadequate.  The trial court reduced Ms. Mansfield's requested fees to $5,580 and Mr. Mansfield's requested fees to $1,175 and accordingly awarded Ms. Mansfield $4,405.

**B.**

The Tennessee Rules of Civil Procedure promote the discovery of relevant, non-privileged information prior to trial.  *Pettus v. Hurst*, 882 S.W.2d 783, 786 (Tenn. Ct. App. 1993); *Wright v. United Servs. Auto. Ass'n*, 789 S.W.2d 911, 915 (Tenn. Ct. App. 1990).  Proper discovery promotes economy and efficiency by helping to identify and narrow the issues for trial.  *See Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 263 (Tenn. Ct. App. 1990).  It also does away with trial by ambush by eliminating the element of surprise.  *Hood v. Roadtec, Inc.*, 785 S.W.2d 359, 362 (Tenn. Ct. App. 1989); *Ingram v. Phillips*, 684 S.W.2d 954, 958 (Tenn. Ct. App. 1984).

Trial courts have broad authority in discovery matters, including the scope of discovery, *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992), the time permitted for discovery, *Payne v. Ramsey*, 591 S.W.2d 434, 436 (Tenn. 1979); *Masters v. Rishton*, 863 S.W.2d 702, 707 (Tenn. Ct. App. 1992), and the imposition of sanctions for abuse of discovery.  *Brooks v. United Uniform Co.*, 682 S.W.2d 913, 915 (Tenn. 1984).  Decisions with regard to these matters are discretionary.

---

[4]Ms. Mansfield's former lawyer stated that his regular rate was $150 per hour and that his paralegal's hourly rate was $65 per hour.  The total cost of the lawyer's time was $2,400 (16 hrs. × $150), and the total cost of the paralegal's time was $4,176.25 (64.25 hrs. × $65).

[5]Mr. Mansfield's lawyer stated that he devoted 12.6 hours to the contempt proceedings and that his normal rate was $125 per hour.

The discovery rules would be ineffectual if courts did not have the authority to impose sanctions for their abuse. 8A Charles A. Wright, et al. *Federal Practice and Procedure* § 2281 (2d ed. 1994). Thus, the Tennessee Rules of Civil Procedure authorize serious sanctions against persons who seek to evade or thwart full and candid discovery, including being found in contempt,[6] having designated facts be taken as established,[7] striking pleadings,[8] dismissing an action or claim or granting a judgment by default,[9] or assessing expenses and attorneys' fees.[10] These sanctions serve a three-fold purpose: (1) to secure a party's compliance with the discovery rules, (2) to deter other litigants from violating the discovery rules, and (3) to punish parties who violate the discovery rules. *Electronic Data Sys. Corp. v. Tyson*, 862 S.W.2d 728, 735 (Tex. Ct. App. 1993). Monetary sanctions serve the additional purpose of providing compensation for the expenses caused by the inappropriate conduct. *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir. 1985).

The authority to impose sanctions for abuse of the discovery process derives from the rules and the court's inherent powers. *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 698-99 (Tenn. 1988); *Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981). Courts may fashion sanctions that are commensurate with a party's conduct. *Pettus v. Hurst*, 882 S.W.2d at 787. Monetary sanctions are now the most common sanction for discovery abuse. When monetary sanctions include legal expenses, the appropriate amount of legal expenses should be determined using the relevant portions of Tenn. S. Ct. R. 8, DR 2-106(B), the rule generally used by courts when they are required to award reasonable attorneys' fees.

### C.

---

[6]Tenn. R. Civ. P. 37.02(D).

[7]Tenn. R. Civ. P. 37.02(A).

[8]Tenn. R. Civ. P. 37.02(C).

[9]Tenn. R. Civ. P. 37.02(C).

[10]Tenn. R. Civ. P. 37.01(4); Tenn. R. Civ. P. 37.02.

Mr. Mansfield does not deny that discovery abuses occurred between January and October 1993. He asserts, however, that monetary sanctions were not warranted because (1) his former lawyer was responsible for the abuses, (2) Ms. Mansfield did not adequately document her claimed expenses, and (3) Ms. Mansfield's claimed expenses involved routine discovery matters, not just the costs incident to the preparation and presentation of the September 1993 motion to compel. We find little merit in these claims.

## CLIENT'S RESPONSIBILITY FOR LAWYER'S CONDUCT

Mr. Mansfield attempts to avoid the monetary sanctions by laying the responsibility for the discovery abuses at his former lawyer's feet. We will not permit him to distance himself from his former lawyer because the record indicates that he was not completely innocent with regard to the untimely and incomplete interrogatories, the failure to return the signed authorizations to gain access to his financial records, and the failure to respond timely and appropriately to the request for production of documents.

Clients in civil proceedings cannot easily avoid the consequences of actions of their voluntarily chosen attorneys. *Link v. Wabash R.R.*, 370 U.S. 626, 633-34, 82 S. Ct. 1386, 1390 (1962); *Johnson v. Allis Chalmers Corp.*, 470 N.W.2d 859, 867-68 (Wis. 1991). Except for certain circumstances not at issue here,[11] a lawyer's conduct during the course of litigation is attributable to and binding on his or her client. *Hart v. First Nat'l Bank*, 690 S.W.2d 536, 539 (Tenn. Ct. App. 1985). Thus, our courts have found that clients are responsible for the manner in which their lawyer initiated a bad check case, *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659-60 (Tenn. 1990), and for their lawyer's failure to pursue adequate discovery and to insist on a jury trial. *Memphis Bd. of Realtors v. Cohen*, 786 S.W.2d 951, 952-53 (Tenn. Ct. App. 1989).

---

[11]Clients are not bound by their lawyer's agreement to dismiss their suit with prejudice unless they have authorized or acquiesced in the dismissal. *Absar v. Jones*, 833 S.W.2d 86, 89 (Tenn. Ct. App. 1992).

Tenn. R. Civ. P. 37.01(4) and Tenn. R. Civ. P. 37.02 permit imposing monetary sanctions for discovery abuse against a party, the party's lawyer, or both. These sanctions must relate directly to the particular type of abuse involved in the case and must not be excessive. The punishment, in other words, must fit the crime and must be visited upon the criminal. Accordingly, as the Supreme Court of Texas has noted,

> The trial court must at least attempt to determine whether the offensive conduct is attributable to counsel only, or to the party only, or to both. This we recognize will not be an easy matter in many instances. On the one hand, a lawyer cannot shield his [or her] client from sanctions; a party must bear some responsibility for its counsel's discovery abuses when it is or should be aware of counsel's conduct and the violation of discovery rules. On the other hand, a party should not be punished for counsel's conduct in which it is not implicated apart from having entrusted to counsel its legal representation.

*Transamerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991).

The root cause of the discovery problems in this case was Mr. Mansfield's insistence throughout most of 1993 that he could not comply with Ms. Mansfield's discovery requests because she had taken a filing cabinet containing his financial records. Ms. Mansfield repeatedly denied taking any of Mr. Mansfield's records, and her denial was substantiated in July 1993 when Mr. Mansfield turned over three boxes containing many of the requested records. The fact that Mr. Mansfield insisted that he did not have records that were actually in his possession warrants concluding that he was directly responsible for many of the discovery delays and that he was aware of his former lawyer's inadequate responses to Ms. Mansfield's discovery requests.

## DOCUMENTATION OF THE LEGAL EXPENSES

Mr. Mansfield also argues that the trial court should have denied Ms. Mansfield's claim for monetary sanctions because she did not present adequate proof of the additional legal expenses she incurred as a result of the discovery

abuse. He bases his argument on this court's unpublished opinion in *Gentry v. Gentry*, App. No. 85-318-II, slip op. at 11-12, 11 T.A.M. 50-8, 1 T.F.L.L. 3-8 (Tenn. Ct. App. Oct. 16, 1986) (No Tenn. R. App. P. 11 application filed) wherein we vacated an award of attorneys' fees in a divorce case because of the absence of a fully developed record containing evidence of the nature of the services rendered, the time spent rendering them, or any of the other factors listed in Tenn. S. Ct. R. 8, DR 2-106(B).

Mr. Mansfield's brief accurately states the rationale of the *Gentry v. Gentry* decision, but it does not go far enough because *Gentry v. Gentry* is no longer controlling precedent in Tennessee. Two years after the *Gentry* decision, the Tennessee Supreme Court held that a fully developed record of the nature of the services rendered was not a prerequisite to an award of attorneys' fees and that trial courts could make proper attorneys' fee awards based on their familiarity with the case and with the factors in Tenn. S. Ct. R. 8, DR 2-106(B). *Kahn v. Kahn*, 756 S.W.2d 685, 696-97 (Tenn. 1988).

The trial judge who imposed the monetary sanctions in this case presided at the divorce trial and was also involved with portions of the pre-trial discovery squabbles. In addition, the parties participated in a hearing during which Ms. Mansfield's former lawyer was examined and cross-examined at length concerning the cost of the additional work required by the discovery abuses. The lawyer also provided an itemized statement detailing all the services provided from October 1991 through January 1994. The statement contained a description of each service and the date on which it was rendered. It also contained the total number of hours spent but did not break down the time required for each particular service. The statement of services rendered and Ms. Mansfield's former lawyer's testimony enabled the trial court to identify the additional services required by the discovery abuse, to determine the reasonable amount of time these services required, and to calculate their cost. Accordingly, we find that the trial court had before it sufficient evidence to assess a financial sanction against Mr. Mansfield.

### SERVICES BEYOND THOSE NORMALLY REQUIRED

As a final matter, Mr. Mansfield insists that the monetary sanctions require him to reimburse Ms. Mansfield for legal services she would have received even if he had not impeded the discovery process and that the sanctions should include only reasonable attorneys' fees incident to the preparation, filing, and presentation of the motion to compel. This argument reflects an inappropriately narrow understanding of the trial court's authority to impose monetary sanctions for discovery abuse.

The trial court has considerable discretion in determining the appropriateness of monetary sanctions. *Shipes v. Trinity Indus.*, 987 F.2d 311, 323 (5th Cir. 1993); *United States v. National Medical Enters., Inc.*, 792 F.2d 906, 910-11 (9th Cir. 1986). While Tenn. R. Civ. P. 37.01(4) is limited to the expenses incurred in obtaining an order compelling discovery, Tenn. R. Civ. P. 37.02 broadly extends to all "reasonable expenses, including attorney's fees, caused by the failure [to comply with the discovery order]." The "reasonable expenses" contemplated by the rule include the expenses required to employ other means to obtain the information sought to be discovered. Thus, federal courts, applying a rule substantially identical to Tenn. R. Civ. P. 37.02, have imposed sanctions for (1) the costs of taking a second deposition when a party improperly refuses to file the first deposition,[12] (2) the costs of taking a deposition after a party improperly destroyed a report,[13] and (3) the costs stemming from a lawyer's discouraging witnesses to provide documents.[14]

Ms. Mansfield incurred additional legal expenses because of Mr. Mansfield's refusal to provide appropriate responses to her interrogatories and her request for production of documents. These expenses relate to (1) drafting and presenting the three motions to compel, (2) drafting the orders granting the

---

[12]*Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 899 (8th Cir. 1978).

[13]*In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979*, 90 F.R.D. 613, 621 (N.D. Ill. 1981).

[14]*United States v. National Medical Enters., Inc.*, 792 F.2d at 911.

motions to compel, (3) preparing and presenting the authorizations to obtain access to Mr. Mansfield's accounts after he refused to produce his financial records, (4) examining and cataloguing the three boxes of unsorted documents belatedly provided by Mr. Mansfield, and (5) preparing the master list of missing documents ordered by the trial court. Ms. Mansfield's evidence amply documented the cost of these services and provided the trial court with an ample evidentiary basis to determine the reasonableness of the claimed expenses in light of Tenn. S. Ct. R. 8, DR 2-106(B). We find that the record supports the trial court's decision that Ms. Mansfield incurred $5,580 in additional legal expenses because of the discovery abuses attributable to Mr. Mansfield and his former lawyer.

## III.

Mr. Mansfield also takes issue with the trial court's decision to require him to be responsible for approximately $11,955 of debts Ms. Mansfield incurred between the time she and her son moved out of the marital home and the date she began to receive alimony *pendente lite*. He insists that these debts were "excessive, unreasonable, and uncontrolled" and that requiring him to pay them would be inequitable. We disagree.

## A.

The Mansfields continued to live in the marital home after Mr. Mansfield filed for divorce in July 1992. Ms. Mansfield and her son moved out of the home in March 1993, and one month later she requested the trial court's permission to remove certain household furnishings from her former residence and also requested
an order directing Mr. Mansfield to provide her additional funds to help her establish a separate household. The trial court ordered Mr. Mansfield to pay Ms. Mansfield $5,200 to help defray her moving expenses and other expenses related to establishing a separate household.

Ms. Mansfield also purchased on credit approximately $11,955 worth of additional furnishings, appliances, and clothing.  After she lost her job with Greenwood Music in August 1993, she requested the trial court to order Mr. Mansfield to pay her alimony *pendente lite* and to provide her with additional funds to pay her lawyer.  On October 11, 1993, the trial court directed Mr. Mansfield to pay Ms. Mansfield $1,200 per month for five months and to pay her an additional $2,000 for her legal expenses.

The trial court divided the marital property and allocated the parties' debts as follows:

**SEPARATE PROPERTY & DEBT**

| Husband | | Wife | |
|---|---|---|---|
| **Assets** | | | |
| 1. Premarital furniture | ? | 1. Premarital furniture | ? |
| 2. House | $ 453,000 | 2. Royalty Interests for Will/Clement | ? |
| 3. Mercedes | 40,000 | 3. Interest in Alcan Music | ? |
| 4. Chemical Bank IRA | 12,850 | 4. Interest in Pride Music | ? |
| 5. CenFed IRA | 81,925 | | |
| 6. Cap. Solid Gold Sav. | 80,965 | | |
| 7. Dean Witter | 13,500 | | |
| | $ 682,240 | | ? |
| **Debts** | | | |
| 1. Home Mortgage | $ 323,000 | | |
| Total Sep. Prop. | $ 359,240 | Total Sep. Prop. | ? |

**MARITAL PROPERTY & DEBT**

| Husband | | Wife | |
|---|---|---|---|
| **Assets** | | | |
| 1. Furnishings | $ 54,835 | 1. Furnishings | $ 12,150 |
| 2. Increase in Home Equity | 47,000 | 2. 1991 Mercedes | 27,800 |
| 3. Bank Accounts | 13,045 | 3. Bank Accounts | 645 |
| 4. Increase / Retirement Accts. | 69,460 | | |
| 5. Increase / Dean Witter Acct. | 15,475 | | |
| 6. Handleman Stock | 5,625 | | |
| 7. STS Acct. | 2,195 | | |
| 8. Woodmont C/C Membership | 23,000 | | |
| 9. Song Bonus | 25,000 | | |
| 10. Phantom Records Bonus | 5,000 | | |
| | $ 260,635 | | $ 40,595 |
| **Debts** | | | |
| 1. Sears | $ 5,580 | 1. Car loan | $ 26,000 |
| 2. Sears | 2,275 | | |
| 3. McClures | 1,245 | | |
| 4. Sprintz | 2,675 | | |
| 5. Dillards | 180 | | |
| | $ 11,955 | | $ 26,000 |
| Total Marital Prop. | $ 248,680 | Total Marital Prop. | $ 14,595 |
| Cash Award | ($ 75,000) | Cash Award | $ 75,000 |
| **NET DISTRIBUTION** | **$ 173,680** | **NET DISTRIBUTION** | **$ 89,595** |

## B.

Trial courts hearing divorce cases are frequently called upon to apportion the parties' debts since few married couples today are debt-free. The process used to allocate debt is similar to the one used to distribute separate and marital property, *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989); *Mahaffey v. Mahaffey*, 775 S.W.2d 618, 623 (Tenn. Ct. App. 1989), and the allocation of debt generally follows the division of the property. *Hanover v. Hanover*, 775 S.W.2d 612, 614 (Tenn. Ct. App. 1989).

In most divorce cases, the trial court first classifies the parties' property, then awards each party their separate property, and then divides the marital property between the parties in an equitable manner. *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). After dividing the property, the trial court must classify the parties' debt and then must apportion the debt between the parties in a just and equitable manner. *Hanover v. Hanover*, 775 S.W.2d at 614. Debts frequently follow their related assets, but they need not be divided in precisely the same manner as the assets. *Mondelli v. Howard*, 780 S. W.2d at 773. In addition to the factors in Tenn. Code Ann. § 36-4-121(c) (1991), trial courts dividing debt should consider (1) the party who incurred the debt, (2) the purpose of the debt, (3) the party or parties who benefitted from the debt, and (4) the party better able to assume the debt. *Mahaffey v. Mahaffey*, 775 S.W.2d at 624.

Trial courts have wide latitude in allocating debt, and appellate courts are hesitant to second-guess their decisions as long as the debt has been properly classified and then divided in a fair and equitable manner. Determining whether debt has been divided fairly and equitably requires appellate courts to consider the trial court's allocation of the debt in light of the division of property and the provision, if any, for spousal support. Accordingly, Tenn. Ct. App. R 15 requires parties who take issue with the allocation of marital debts to include with their

brief a tabular summary of the classification and division of the parties' debts and assets.[15]

## C.

The debts challenged by Mr. Mansfield were incurred by Ms. Mansfield while she was establishing a new residence after she moved out of the marital home. While she was the chief beneficiary of these expenditures, her purchases were consistent with the types of furnishings the parties had purchased earlier for the marital home, and the total amount of the charges was only a fraction of the cost of the furnishings that Ms. Mansfield left in the house for Mr. Mansfield.

Ms. Mansfield incurred these debts at a time when Mr. Mansfield was not paying alimony *pendente lite*, and Mr. Mansfield could more easily repay these debts after Ms. Mansfield lost her job in August 1993. Because of Mr. Mansfield's superior earning power and because he received the bulk of the marital property, we conclude that the trial court did not act inequitably by requiring Mr. Mansfield to assume responsibility for Ms. Mansfield's pre-divorce debts.

## IV.

As a final matter, Mr. Mansfield takes issue with the portion of the trial court's July 13, 1994 order directing him to pay Ms. Mansfield $2,400 representing the alimony *pendente lite* payments for March and April 1994. He now argues that Ms. Mansfield did not need these funds because he paid her the $75,000 ordered by the trial court in late April 1994. We find that Mr. Mansfield has waived his opportunity to challenge this award on appeal because he did not take issue with it in the trial court.

---

[15]Mr. Mansfield's lengthy brief included a table that included just the five disputed debts. It would have been better practice to list all the parties' debts and assets in the table. Including only the disputed debts does not provide the reviewing court with an overview of the manner in which the trial court divided the entire marital estate. Ms. Mansfield's brief contained no tabulation of any sort.

The October 1993 order required Mr. Mansfield to pay alimony *pendente lite* payments for only five months. Thus, his obligation to pay Ms. Mansfield alimony *pendente lite* expired with his fifth payment in February 1994. The trial was delayed because Ms. Mansfield changed lawyers. Following the divorce hearing, the trial court directed Mr. Mansfield to continue to pay Ms. Mansfield $1,200 per month and to pay her car note until he paid her the $75,000 for her contributions to the appreciation in the value of his separate property. Mr. Mansfield paid Ms. Mansfield the entire $75,000 in late April 1994 thereby avoiding any continuing obligation to make monthly payments of any sort to Ms. Mansfield.

At a hearing in June 1994, Mr. Mansfield's lawyer informed the trial court that he

> could not determine if you meant that support starts for April, when Your Honor issued the memorandum, or if it goes back to March.
>
> And if Your Honor says that it does, then I'll advise my client, and he'll have to pay the difference. He's got a good track record showing that he will pay whatever this Court orders.

In response to this statement, the trial court determined that it had intended that the payments should relate back to March 1994.

Tenn. R. App. P. 36(a) provides that relief on appeal should not be granted to parties who are responsible for an error in the trial court or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error. Rather than asserting that requiring the $1,200 payments for March and April would be error, Mr. Mansfield's lawyer simply sought clarification of the judge's memorandum and, upon receiving that clarification, stated that Mr. Mansfield would "pay the difference." This concession in the trial court places the propriety of the award beyond Mr. Mansfield's reach on appeal.

**V.**

Ms. Mansfield asserts that she in entitled to an additional award to defray her legal expenses both in the trial court and on appeal. The trial court has already awarded Ms. Mansfield a judgment for her additional attorneys' fees brought about by Mr. Mansfield's discovery abuse and also awarded her $2,000 for her legal fees *pendente lite*. Under the facts and circumstances of this case, we have determined that these awards are sufficient and that Ms. Mansfield is not entitled to receive an additional award for her legal expenses at trial or on appeal.

An additional award for legal expenses is appropriate in a divorce case when an economically disadvantaged spouse lacks sufficient funds to pay for his or her legal representation. *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986). It is inappropriate, however, when the requesting spouse is able to pay his or her lawyer either from his or her own earnings or from the assets received in the divorce. *Inman v. Inman*, 811 S.W.2d 870, 874 (Tenn. 1991); *McCarty v. McCarty*, 863 S.W.2d 716, 722 (Tenn. Ct. App. 1992); *Thompson v. Thompson*, 797 S.W.2d 599, 605 (Tenn. Ct. App. 1990). The trial courts have broad discretionary authority with regard to these awards, and their decisions will not be disturbed on appeal unless they are contrary to the preponderance of the evidence. *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983); *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992); *Hardin v. Hardin*, 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983).

Ms. Mansfield is employable and has marketable skills as a result of her broad experience in the music business. She also owns royalty rights that, by her own evidence, produce income of approximately $900 per month. In addition, she has received $75,000 from Mr. Mansfield in payment for her contributions to the increase in the value of Mr. Mansfield's separate assets during the parties' marriage. In light of the assets she has received as well as the trial court's findings concerning her earning capacity, we decline to award Ms. Mansfield additional funds to help defray her legal expenses.

**VI.**

The judgments are affirmed, and the case is remanded to the trial court for whatever further proceedings may be required.  We tax the costs of this appeal to Joseph F. Mansfield and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____
HENRY F. TODD, P.J., M.S.


_____
SAMUEL L. LEWIS, JUDGE